# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GUADALUPE PEREZ, individually and on behalf of all others similarly situated, | ) ) Case No.: |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| PHILIPS NORTH AMERICA LLC, | ) |
| | ) |
| Defendant. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Guadalupe Perez ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, brings this class action complaint against Defendant Philips North America LLC ("Defendant" or "Philips") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, labeling, distribution, and sale of Philips Avent- branded Bottle Bottles ("Products")[1] that are sold nationwide and marketed as, among other things, "BPA Free" (the "Representations"). Unfortunately for all reasonable consumers, including Plaintiff, these claims are false and misleading.

---

[1] The Products refer to the following Philips Avent product varieties: Anti-Colic Baby Bottle, Anti-Colic Baby Bottle with AirFree Vent, and Natural Baby Bottle with and without natural Response Nipple Baby Bottle. Plaintiff reserves the right to amend the complete list of Products subject to this lawsuit based on facts obtained in discovery. All of the Products contain the same substantially similar representations and omissions about being "BPA Free" and overall safe to use as intended, which Plaintiff and the Class read and relied on before purchasing the Products.

2.      Far from being "BPA Free," the Products contain considerable amounts of harmful microplastics.

3.      Despite including harmful microplastics in its Products, Defendant goes to considerable lengths to mislead consumers into believing the Products are safe, good for them, and without BPA. Moreover, Defendant omits the Products contain harmful microplastics, especially when heated – a material fact to Plaintiff and all reasonable consumers – on the Products' labeling and marketing.

4.      Defendant makes the Representations and omissions to increase profits and market share in the growing baby products market where safety is a significant consumer purchasing decision. Indeed, consumers value products free of BPA that promote safety.

5.      Consumers have become increasingly concerned about the effects of synthetic, artificial, and chemical ingredients in food, dietary supplements, cleaning products, bath and beauty products, and everyday household products. Companies like Defendant have capitalized on consumers' desire for purportedly "natural products." Indeed, consumers are willing to pay and have paid a premium for products branded "natural" over products that contain synthetic ingredients. In 2015, sales of natural products grew 9.5% to $180 billion.[2]  Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products not considered "BPA Free."

---

[2]  *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also*  Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth?  [NEXT  Forecast  2017]*,  NEW  HOPE  NTWORK  (December  20,  2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

6.      Before placing the Products into the stream of commerce and into the hands of consumers to purchase and children to put in their mouths, Defendant knew or should have known that the Products contained harmful microplastics. However, Defendant misrepresented, omitted, and concealed this material fact to all reasonable consumers, including Plaintiff and Class members, by not including this information anywhere on the Products' labeling.

7.      Plaintiff and Class members reasonably relied on Defendant's Representations and material omissions when purchasing the Products.

8.      Plaintiff and Class members purchased the Products and paid a price premium based on Defendant's Representations and omissions.

9.      Because Defendant's false and misleading Representations dupe reasonable consumers into believing the Products feature premium attributes (i.e., without BPA), Defendant's Representations thus dupe reasonable consumers into paying premium prices for the Products, even though they do not actually feature the premium attributes for which the consumers, including Plaintiff and class members, pay.

10.      Defendant is, therefore, liable to Plaintiff and Class members for selling the Products without disclosing that the Products contain harmful microplastics.

11.      This lawsuit seeks to recover monetary damages on behalf of Plaintiff and a Nationwide Class of purchasers of the Products, including Massachusetts.

**PARTIES**

12.      Plaintiff Guadalupe Perez is a resident and citizen of Chicago, Illinois. Plaintiff purchased numerous varieties of the Products, including Philips Avent Natural Baby Bottle with Natural Response Nipple multiple times during any statutory limitations period. Plaintiff

purchased the Products mostly recently within the last three to five months at Target and Walmart in Illinois at the Products' retail price.

13.     Plaintiff and reasonable consumers believe that products labeled as "BPA Free" do not contain harmful microplastics. Plaintiff and reasonable consumers believe "BPA Free" means that the Products do not pose the danger of harmful plastics when used as intended.

14.     When purchasing the Products, Plaintiff read and reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were adequately manufactured, labeled, free from defects, and that the Representations were true. Plaintiff read and relied on Defendant's Representations and warranties when deciding to purchase the Products, and these Representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive Representations and omissions alleged herein regarding the Products, Plaintiff would not have been willing to purchase the Products. Plaintiff paid a price premium for the Products based on Defendant's Representations, material omissions, and warranties. Accordingly, Plaintiff was injured and lost money due to Defendant's mislabeling and deceptive conduct.

15.     Defendant Philips North America LLC is a limited liability company with its principal place of business and headquarters in Cambridge, Massachusetts.

16.     Philips says it is "a focused leader in health technology" that "consider[s] people's entire health journey."[3] The company also claims to do business "responsibly and sustainably."[4]

17.     Philips sells a massive amount of consumer products nationwide, including baby bottles and nipples, under the "Philips Avent" product line.[5]

---

[3] https://www.usa.philips.com/a-w/about.html
[4] Id.
[5] https://www.usa.philips.com/c-m-mo/baby-bottles-nipples/latest#availability=instock

18.     The Cambridge Chamber of Commerce says Philips is located at 222 Jacobs Street Cambridge MA 02141.[6] On that website, Philips claims, "Philips is a leading health technology company focused on improving people's health and enabling better outcomes across the health continuum from healthy living and prevention, to diagnosis, treatment and home care."[7]

19.     Based on information, belief, and public information, the citizenship of the Defendant's LLC's members is Massachusetts.

20.     Defendant sells the Products throughout the United States, including Massachusetts. The Products, including those purchased by Plaintiff and Class members, are available at various retail stores throughout the United States, including Massachusetts. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products to consumers nationwide, including Massachusetts.

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

22.     This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise from Defendant's contacts with this District. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers, and/or representatives, operated, conducted, engaged in, and carried on a

---

[6] https://business.cambridgechamber.org/list/member/philips-north-america-49971
[7] Id.

business venture in Massachusetts, and/or marketed, advertised, distributed and/or sold the Products, committed a statutory violation within Massachusetts related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of Massachusetts, during the relevant time period. At that time, Defendant was engaged in business activities in Massachusetts.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in Massachusetts. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District through the promotion, sale, and marketing of the Products in this District. Venue is also proper because Defendant and its members reside in and are citizens of this District.

## COMMON FACTUAL ALLEGATIONS

### Microplastics Harm Human Health

24.     Microplastics are small plastic particles less than 5 millimeters in diameter that form when solid plastics break down through abrasion, degradation, or chemical processes such as exposure to heat.[8] These tiny particles can significantly affect human health, especially children.[9]

---

[8] *See* Sumon Sarkar, Hanin Diab & Jonthan Thompson, Microplastic Pollution: Chemical Characterization and Impact on Wildlife, 20(3) Int. J. Environ. Res. Public Health 1745 (2023).
[9] *See* Raffaele Marfella et al., Microplastics and Nanoplastics in Atheromas and Cardiovascular Events, 390 NEW ENGLAND J. MED. 900–910 (Mar. 6, 2024), https://www.nejm.org/doi/full/10.1056/NEJMoa2309822 (concluding that "patients with carotid artery plaque in which [microplastics and nanoplastics (MNPs)] were detected had a higher risk of a composite of myocardial infarction, stroke, or death from any cause at 34 months of follow-up than those in whom MNPs were not detected").

25.     Studies show that microplastics alter the composition of gut microbiota, which play a crucial role in digestion, nutrient absorption, and immune system development.[10] Furthermore, microplastics "produc[e] a toxic effect on the digestive tract," that causes irreversible changes in the reproductive axis and central nervous system of offspring after prenatal and neonatal exposure, affect the immune system due to their physicochemical properties, and can cause chronic pulmonary disease.[11]

26.     Due to their small size, microplastics can bioaccumulate, which results in compounding adverse health effects, such as growth and reproduction issues, DNA damage due to oxidative stress, inflammation, physical stress, weakened immunity, histological damage, or even death.[12]

27.     Digestion or oral intake is the most significant mode of microplastic transmission into the human body.[13]

**Microplastics Are Particularly Harmful to Children.**

28.     The dangers of microplastic exposure are particularly severe for infants, as these early encounters with microplastics can pave the way for chronic health conditions that can manifest over a lifetime.[14] Exposure to even low doses of microplastics during a child's early development may cause long-term health complications later in life.[15] Experts in microplastics

---

[10] *See* Alba Tamargo et al., PET Microplastics Affect Human Gut Microbiota Communities During Simulated Gastrointestinal Digestion, First Evidence of Plausible Polymer Biodegradation During Human Digestion, 12 SCI. REPS. 528 (Jan. 11, 2022), https://doi.org/10.1038/s41598-021-04489-w ("The work presented here indicates that microplastics are indeed capable of digestive-level health effects.").

[11] Nur Hanisah Amran et al., Exposure to Microplastics During Early Developmental Stage: Review of Current Evidence, 10 TOXICS 597 (Oct. 10, 2022), https://doi.org/10.3390/toxics10100597.

[12] Id.

[13] Id.

[14] Id.; see also Liping Liu et al., Release of Microplastics from Breastmilk Storage Bags and Assessment of Intake by Infants: A Preliminary Study, 323 ENV'T POLLUTION (Apr. 15, 2023), at 2, https://doi.org/10.1016/j.envpol.2023.121197 ("Exposure to low doses of [microplastics] during early development may cause perturbation of gas and nutrients exchange and induce long-term health effects.").

[15] Amran supra note 6.

warn that infants, with their entire lives ahead of them, face a heightened risk of developing lifelong ailments due to their prolonged exposure to microplastics starting from such a young age.[16]

29.    During critical periods of development, such as infancy and early childhood, exposure to microplastics can profoundly impact various bodily systems—including the digestive, reproductive, central nervous, immune, and circulatory systems—leading to long-term health impairments.[17]

30.    This extreme harm is particularly critical in infants, who may suffer from a wide array of severe health issues because of microplastic exposure. One study found that average fecal microplastic levels were over ten times higher in infants than in adults.[18] Scientists studying microplastics and early child development have therefore emphasized that "enacting solid legislative laws and policies to manage the excessive use of plastic products is crucial; otherwise, the health of ecosystems and living organisms will inevitably deteriorate in the coming years. […] We feel that the government and industries must exert the most significant effort to protect children from MPs [microplastics] exposure. These procedures include avoiding plastic contact of children's meals[.]"[19]

31.    Another study emphasized the consequences of microplastic ingestion on cardiovascular systems, finding that subjects with "carotid artery plaque in which microplastics

---

[16] Liping Liu et al., Release of Microplastics from Breastmilk Storage Bags and Assessment of Intake by    Infants: A    Preliminary    Study, 323    ENV'T POLLUTION    (Apr.    15,    2023), at    1, https://doi.org/10.1016/j.envpol.2023.121197 ("Infancy is known to be a sensitive window for environmental exposure, which may increase susceptibility to certain diseases in adulthood.").
[17] Id.
[18] News Release, AM. CHEM. SOC'Y, Infants Have More Microplastics in Their Feces Than Adults, Study Finds (Sept.    22,    2021),    https://www.acs.org/pressroom/newsreleases/2021/september/infants-have-more-microplastics-in- their-feces-than-adults-study-finds.html.
[19] Amran supra note 6.

were detected had a higher risk of a composite myocardial infarction, stroke, or death from any cause."[20]

32.     Despite the apparent dangers, Defendant actively conceals the known risks associated with microplastic exposure, depriving parents of the ability to make informed choices about their children's health and well-being. The Products' material omissions and the "Made BPA Free" representations work in tandem to create a false sense of security, leading parents to believe that their children will be safe from the severe consequences of using the Products. In reality, parents are exposing their children to "irreversible changes in the reproductive axis and central nervous system, " among other harms.[21]

### The Products Are Made of Polypropylene Plastic and Are Exposed to Heat Through Ordinary Use.

33.     Plaintiff and other reasonable consumers understand that the regular and ordinary use of baby bottles involves holding heated liquids (such as formula or breastmilk) and possibly using boiling liquids for sterilization. Defendant fails to inform consumers that the Products made of polypropylene "release microplastics with values as high as 16,200,000 particles per litre," and that "sterilization and exposure to high-temperature water significantly increase microplastic release."[22] By advertising and selling the Products without disclosing the material risks associated with heating, Defendant jeopardizes the health and well-being of countless children and misleads parents who trust in the safety of these Products.

---

[20] Marfella, supra note 4.
[21] Amran supra note 6.
[22] Dunzhu Li et al., Microplastic Release from the Degradation of Polypropylene Feeding Bottles During    Infant Formula Preparation, 1    NATURE    FOOD 746,    746    (Nov. 2020), https://doi.org/10.1038/s43016-020-00171-y.

34.     Heating polypropylene releases 13.5% to 67.5% more microplastics into liquids at 140 degrees Fahrenheit than at 41 degrees.[23] Products with polypropylene plastic composition release microplastics through sterilization and cleaning, shaking with warm water, and other high-temperature water exposure during formula preparation procedures.[24] "Microplastics are synthetic polymer compounds that form when large plastic materials are fragmented and micronized to a size of ≤5 mm."[25] One study found that polypropylene infant feeding bottles can produce up to 16 million microplastic particles per liter.[26] The amount of microplastics released increases with exposure to high water temperatures and sterilization.[27]

35.     Current research shows that toddlers consuming microwaved dairy products from polypropylene containers can intake up to 22.1 ng/kg per day of microplastics.[28] Another study found that a single infant's microplastic consumption through polypropylene feeding bottles ranges from 14,600 to 4,550,000 particles per day.[29]

36.     Exposing plastic containers to higher temperatures leads to a more than twofold increase in the total amount of microplastics released.[30] However, it is estimated that roughly 12% of those who reheat breastmilk use the microwave.[31] Defendant fails to warn consumers that its Products should not be heated due to extreme microplastic exposure increases.

---

[23] Guanyu Zhou et al., How Many Microplastics do We Ingest When Using Disposable Drink Cups?, 441 J. HAZARDOUS MATERIALS (Jan. 2023), at 5, https://doi.org/10.1016/j.jhazmat.2022.129982.
[24] Li, supra note 18.
[25] Yongjin Lee et al., Health Effects of Microplastic Exposures: Current Issues and Perspectives in South Korea, 64 YONSEI MED. J. 301, 301 (May 2023), https://doi.org/10.3349/ymj.2023.0048.
[26] Li, supra note 18.
[27] Id.
[28] Kazi Albab Hussain et al., Assessing the Release of Microplastics and Nanoplastics from Plastic Containers and Reusable Food Pouches: Implications for Human Health, 57 ENV'T SCI. & TECH. 9782, 9782 (2023), https://pubmed.ncbi.nlm.nih.gov/37343248/.
[29] Id.
[30] Id.
[31] See id. ("These findings are consistent with a previous study that reported a 2 order magnitude increase in microplastics release from polypropylene infant feeding bottles into water when temperatures increased from 25 to 95 °C.").

37.     Additionally, many parents sanitize baby feeding products via exposure to heat, such as by boiling the products.[32] One study found that over 10 million polypropylene microplastics per liter are released during a single boil.[33] The CDC recommends that caretakers sterilize baby feeding equipment daily.[34] Even if the Products are not heated with milk, the sterilization heat still causes the Products to release copious amounts of microplastics.

38.     Despite these apparent risks, Defendant fails to inform consumers of the need to mitigate the associated microplastic release to prevent them from entering the food and drink in the Products, such as by repeated subsequent rinses with cold water.[35]

### **The Products are Intended to be Heated daily and for constant use by Babies and Their Caregivers.**

39.     The Products are essential feeding devices that infants and young children use multiple times daily.[36] It is a well-known fact that babies often have their bottles or cups in or near their mouths for extended periods. This constant, repeated exposure to the Products significantly amplifies the risk posed by the microplastics they leach.

40.     The danger of microplastics lies not just in a single exposure but in their ability to bioaccumulate in the body over time. Each instance of exposure compounds the potential for long-term harm. For infants and young children, who are in a critical stage of development, this accumulated exposure can have devastating consequences. When parents use Defendant's Products to feed their children, as intended, they unwittingly expose their vulnerable infants to a

---

[32] Li, supra note 18.
[33] Centers for Disease Control and Prevention, How to Clean, Sanitize, and Store Infant Feeding Items (Apr. 16, 2024), https://www.cdc.gov/hygiene/childcare/clean-sanitize.html.
[34] How to Clean, Sanitize, and Store Infant Feeding Items, supra note 29.
[35] Li, supra note 18.
[36] Mary L. Gavin, Formula Feeding FAQs: How Much and How Often, KIDS HEALTH (November 2021) https://kidshealth.org/en/parents/formulafeed
often.html#:~:text=Newborns%20and%20young%20babies%20should,about%20every%203%E2
%80%934%20hours.

daily dose of microplastics. Over the weeks, months, and years of a child's development, this constant exposure can lead to a dangerous accumulation of microplastics in their young bodies, putting them at risk for a host of serious health issues affecting their digestive system, immune function, reproductive health, and more. The cumulative nature of this risk makes Defendant's misconduct all the more egregious and the need for accountability all the more urgent.

**V. Defendant's Products' Labeling Contains False and Misleading Representations.**

41.     Defendant manufacturers, markets, sells, and distributes Products, which all contain the exact substantially similar "BPA Free" front-label representations as depicted below:







Defendant's "BPA Free" Representations are also made consistently on Defendant's website and Defendant's Products' pages on various retailers' websites. For example:



reflux. The unique AirFree vent is designed to draw air away from the nipple keeping it full of milk to avoid air ingestion. This vent also keeps the nipple full of milk even when the bottle is held horizontal, allowing for upright feeding. Feeding in an upright position can help to reduce reflux and aid in digestion. The nipple shape is designed for a secure latch for a comfortable feed. The bottle is easy to clean and assemble with few parts. The AirFree vent is only one piece and is easy to clean without any special tools. The Anti-colic bottle features a valve, integrated into the nipple, that reduces vacuum buildup and reducing air into your baby's tummy. The Anti-colic bottle can be used with or without the AirFree vent, giving you the option based on your baby's feeding needs. The soft silicone nipple is available in different flow rates for babies of all ages, flows 1-4. We recommend using the Philips Avent Anti-colic baby bottle with Philips Avent Anti-colic bottle nipples. Includes 4 9oz Anti-colic bottles with AirFree vent with Flow 2 nipples. SCY703/04.

### Features & details

- Designed to reduce feeding issues: colic, gas, and reflux
- AirFree vent keeps nipple full of milk, not air
- AirFree vent makes it easy to feed in an upright position by keeping the nipple full of milk
- Easy to clean and assemble wide neck bottle with only a few parts
- BPA free Bottle can be used with or without the AirFree vent
- Bottle Nipple comes in Flow 2



How does airfree vent work?     Is airfree vent easy to clea

14



Philips Support

# What are the Philips Avent bottles and parts made of?

Published on 09 January 2024

The Philips Avent bottles are made of 100% BPA-free material. The bottles are made of polypropylene or polyethersulfone.

## BPA-free parts

All Philips Avent parts that come in contact with breast milk and food are 100% BPA free. The Philips Avent nipples are made of Silicone and the AirFree vent insert is made out PBT and Silicone (LSR).



[37]

42.     Defendant's Products are manufactured, distributed, and sold throughout the United States, including Massachusetts. They are sold in-store at mass-market retailers and online

---

[37] https://www.usa.philips.com/c-f/XC000001768/what-are-the-philips-avent-bottles-and-parts-made-of

at places like Amazon.com. Defendant's BPA Free Representations appear on the front labeling of the Products, as well as on Defendant's website and retailers' websites.

43.     The Representations are forward-facing to the consumer. Reasonable consumers read and relied on the Representations, which are false and misleading because the Products produce harmful microplastics when heated for everyday use.

44.     Had Plaintiff and Class Members known that the Products contained harmful microplastics or risked containing harmful microplastics when used normally, Plaintiff and Class Members would not have purchased the Products or would have paid less for them.

**Defendant Also Makes Material Omissions That Mislead Reasonable Consumers About the Products' Safety and Conceals the Presence of Harmful Microplastics.**

45.     Defendant materially omits that the Products pose the danger of leaching microplastics, which causes detrimental long-term harm to children. Reasonable consumers expect manufacturers to disclose dangers associated with their products. This is especially true for manufacturers of baby products as these products are intended for society's most vulnerable population, and therefore, consumers expect a heightened degree of safety for such products.

46.     Defendant fails to live up to the reasonable consumer's expectations of the Products because the Products leaches microplastics into the bottle's contents upon heating through ordinary use, contaminating the food babies and infants consume. Defendant, therefore, misleads reasonable consumers through its material omission into believing the Products are safe and do not pose any safety risks.

**Defendant Further Misleads Consumers About the Products' Safety.**

47.     Defendant fails to disclose the safety risks and represents that the Products are "BPA Free" on the front labels of its Products. "BPA" stands for Bisphenol A. BPA is a chemical used to manufacture polycarbonate plastics that leach into food and beverages. BPA causes

negative health effects on the reproductive system, child development, metabolic disorders, obesity, endocrine disorders, and the nervous system.[38] BPA can also damage DNA, cause oxidative stress, and promote certain breast cancers.[39] Bottles made with BPA present a similar danger as bottles made from polypropylene as both bottles leach harmful substances when heated and cause negative health impacts to the human digestive system, immune system, and reproductive system. Reasonable consumers interpret "BPA Free" to mean that the Products do not pose the danger of harmful plastics. In tandem with Defendant's material omissions, reasonable consumers believe that the Products are safe, i.e., do not pose the risks associated with harmful plastics.

**<u>Plaintiff and Reasonable Consumers Were Misled by the Material Omissions and Representations into Buying the Products.</u>**

48.     Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products materially omitting the danger and risk from the Products' front-facing labels and packaging.

49.     Defendant conspicuously displays the "BPA Free" claim on the Products' labeling and packaging yet fails to tell consumers that the Products will leak dangerous microplastics through ordinary use.

50.     Defendant's material omissions and Representations lead reasonable consumers, like Plaintiff, into believing that the Products are safe—meaning, consumers are led to believe that the Products are a safer choice for feeding babies and young children that do not pose the risk.

51.     Defendant's omissions are material to reasonable consumers, including Plaintiffs, in deciding to buy the Products because reasonable consumers value information relating to the

---

[38] Bisphenol A (BPA) Factsheet, supra note 1; M. Thoene, supra note 1.
[39] Id.

Products' safety. This is especially true when it concerns using the Products in their intended and ordinary way, which results in harmful plastics being consumed by babies—meaning that it is important to consumers that the Products are safe and motivates them to buy them.

52.     The Class, including Plaintiff, reasonably relied on Defendant's omissions in purchasing the Products.

53.     Defendant's omissions are deceptive because the Products leach microplastics into milk and formula during ordinary use.

54.     When purchasing the Products, the Class members, including Plaintiff, were unaware and had no reason to believe that the omissions were misleading, deceptive, and unlawful. The Products' labeling and packaging led consumers to believe that the Products were free from harmful plastic exposure. The Products did not contain a clear, unambiguous, and conspicuously displayed statement informing reasonable consumers that the Products posed the risk of containing harmful microplastics.

**Defendant's Knowledge.**

55.     Defendant knew that the omissions were misleading, deceptive, and unlawful, at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products.

56.     Defendant knew that the omissions would lead reasonable consumers into believing that the Products would not expose their infants and young children to harmful microplastics. Not only has Defendant utilized a long-standing brand strategy to identify the Products as safe, but Defendant also has an obligation under section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. §§ 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendant was statutorily obligated to consider whether the omissions, in isolation or conjunction with its marketing strategy, would mislead reasonable consumers into

believing that the Products are free from harmful microplastic exposure. Thus, Defendant knew that the omissions were misleading before it marketed the Products to the Class, including Plaintiff.

57.     Defendant knew of its omissions' materiality to consumers. First, manufacturers and marketers, like Defendant, know safety is paramount for consumers of baby and infant products. Here, the omission relates directly to the Products' safety. Second, Defendant's awareness of the importance of the Products' safety, specifically safety related to harmful plastics, is reflected by its "BPA Free" representation on the Products' front labels and packaging consistent throughout all Product packaging and labeling. Third, it is common sense that information concerning the risk of harmful microplastics and the Products' safety is material to consumers as Defendant knows that the risk of health complications from using the Products would affect whether consumers purchased the Products.

58.     Even worse, as the manufacturer and marketer of the Products, Defendant had exclusive control over the omissions and Representations on the Products' labels, packaging, and advertisements. Defendant could have easily disclosed the risks or rectified consumers' misplaced beliefs by informing them about the leaching of microplastics. However, despite Defendant's knowledge of the falsity of the omissions and its awareness that consumers reasonably rely on these representations and omissions when deciding to purchase the Products, Defendant deliberately chose to market the Products with the misleading omissions. This decision led consumers to buy or overpay for the Products, believing they possessed attributes that Defendant falsely advertised and warranted. Therefore, at all relevant times, Defendant knew that the omissions would mislead reasonable consumers, such as Plaintiff, into purchasing the Products to obtain the product attributes that Defendant deceptively portrayed.

**Defendant Had a Duty to Disclose.**

59.     Defendant had an obligation, at all relevant times, to disclose the material omissions—that the Products leach harmful microplastics into milk or formula during ordinary use. This crucial information, which Defendant deliberately withheld from consumers, is material to their purchasing decisions and has far-reaching consequences for the health and well-being of infants and young children. Defendant knew that reasonable consumers would perceive the Products and the absence of the material omissions to mean that the Products were free from harmful plastics. It was also known that this attribute was a key factor influencing consumers' choices, causing them to rely on the absence of material omission when deciding to purchase the products.

60.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains harmful microplastics, especially at the point of sale. Discovering this information requires a scientific investigation and knowledge of chemistry beyond the average consumer.

61.     Plaintiff and similarly situated consumers would not have purchased the Products or would not have overpaid a price premium for them if they had known that the Products posed a safety risk and, therefore, that the Products do not have the attribute claimed, promised, warranted, advertised, and/or represented. Accordingly, based on Defendant's material omissions, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

**Defendant's Knowledge, Representations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers – This Conduct is Deceptive *and* Unfair under the ICFA.**

62.     To drive up sales in the competitive baby products market and expand its market share, Defendant knowingly omits the material fact that the Products contain or risk containing harmful microplastics when heated up and used normally.

63.     Thus, reasonable consumers who are shopping for products free of BPA purchase Defendant's products based on the above representations and material omissions made by Defendant at the point of sale. But for Defendant's false and misleading labeling Representations, these customers would not have purchased Defendant' Products or would not have paid as much as they did.

64.     Additionally, a large cross-section of customers, particularly those in the "clean labeling" movements, will not consider purchasing products that contain or risk containing BPA. These customers chose to purchase Defendant's Products based on the false belief that they did not have harmful microplastics and were safe to use as intended. But for Defendant's false and misleading labeling statements, these customers would not have purchased the Products or would have paid less for the Products.

65.     Philips, a large, sophisticated worldwide company that manufactures, distributes, and sells consumer products, including baby products, knew or should have known that the products contained harmful microplastics.

66.     Defendant sold, and continues to sell, the Products containing harmful microplastics during the relevant class period despite Defendant's knowledge of the presence of harmful microplastics when the Products are heated during normal use.

67.     Defendant has engaged in deceptive, untrue, and misleading advertising by making labeling Representations discussed above. Defendant's conduct is also deceptive because Defendant omits the material fact that the Products contain harmful microplastics. Defendant's conduct is also **unfair** for all of the reasons discussed above.

68.     Plaintiff would not have purchased the Products or paid as much for them had they been truthfully and accurately labeled.

69.     Had Defendant adequately tested the Products, it would have been discovered that the Products contained harmful or risked harmful microplastics when heated during normal use, making the Products containing the false Representations illegal to distribute, market, and sell.

70.     Defendant's concealment was material and intentional because people are concerned with what is in the products they and their children use to put in their mouths. Consumers such as Plaintiff and class members make purchasing decisions based on the Representations made on the Products' labeling.

71.     Defendant knows that if it had not made the material omissions and Representations, then Plaintiff and class members would not have purchased the Products or would not have paid as much as they did.

**Injuries to Plaintiff and Class Members – and the Public at Large.**

72.     When Plaintiff purchased Defendant's Products, Plaintiff did not know and had no reason to know that Defendant's Products contained harmful microplastics.

73.     Indeed, consumers cannot test or independently ascertain or verify whether a product contains harmful microplastics, especially when heated, at the point of sale. Therefore, they must trust and rely on Defendant to truthfully and honestly report what the Products contain on their packaging and labeling.

74.     Further, given Defendant's position as a nationwide leader in the consumer products and baby products industry, Plaintiff and all reasonable consumers trusted and relied on Defendant's Representations and omissions regarding the Products.

75.     Yet, when consumers look at the Products' packaging, there is no mention of microplastics. On the contrary, the Products say they are "BPA Free."

76.     No reasonable consumer, including Plaintiff, would have paid as much for Defendant's Products containing the Representations had they known those Products contained

any amount of harmful or potentially harmful microplastics, let alone at the limits found in Defendant's Products – making such omitted facts material to them.

77.     Defendant's false, misleading, and deceptive Representations and omissions made on the labeling of the Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and the Class Members.

78.     Plaintiff and Class members are entitled to statutory and punitive damages, equitable relief, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

79.     Plaintiff, individually and on behalf of all others, brings this class action pursuant to Fed. R. Civ. P. 23.

80.     Plaintiff seeks to represent a class defined as:

> All persons who purchased Products in the United States for personal or household use during the fullest period provided by law ("Nationwide Class").

81.     Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased the Products in Illinois for personal or household use during the fullest period provided by law ("Illinois Subclass").

82.     Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and their current or former employees, officers, and directors; (3) individuals who allege personal bodily injury resulting from the use of the Products; and (4) resellers of the Products.

83.     Plaintiff reserves the right to modify, change or expand the definitions of the Class based upon discovery and further investigation.

84. *Numerosity*: The Class is so numerous that the joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

85. *Commonality*: Questions of law or fact common to the Class include, without limitation:

a. Whether the Products contain microplastics;

b. Whether a reasonable consumer would consider the presence of harmful microplastics in the Products (and omission thereof) to be material;

c. Whether Defendant knew or should have known that the Products contain harmful microplastics;

d. Whether Defendant's Representations and/or omissions are deceptive;

e. Whether Defendant's Representations and/or omissions are false and misleading;

f. Whether Defendant failed to disclose that the Products contain harmful microplastics;

g. Whether Defendant concealed that the Products contain microplastics;

h. Whether Defendant engaged in **<u>unfair or</u>** deceptive trade practices;

i. Whether Defendant violated the state consumer protection statutes alleged herein;

j. Whether Defendant was unjustly enriched; and

k. Whether Plaintiff and Class members are entitled to monetary damages or other damages proscribed by the Court.

86. *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in the same manner, have the same claims

against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

87.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in prosecuting complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to prosecute this action vigorously.

88.     *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with multiple lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties likely to be encountered in managing this action that would preclude its maintenance as a class action.

89.     Accordingly, this class action may be maintained under Fed. R. Civ. P. 23(b)(2) and (b)(3).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT, 815 ILCS 505/1, et seq. ("ICFA")
### (On behalf of Plaintiff and Illinois Subclass)

90.    Plaintiff re-alleges and incorporates all preceding factual allegations as set forth fully herein.

91.    Plaintiff brings this cause of action on behalf of herself and the Illinois Subclass Members against Defendant.

92.    Plaintiff and other Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA"), 815 ILCS 505/1(c).

93.    Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

94.    At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

95.    Plaintiff and the proposed Class are "consumers" who purchased the Products for personal, family, or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

96.    The ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer of this State or the United States." 815 ILCS 505/10b(1).

97.    The ICFA prohibits engaging in "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

98.    The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices, including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or

employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

99.     Plaintiff and the other Subclass Members reasonably relied upon Defendant's Representations and omissions alleged herein regarding harmful microplastics in the Products. Plaintiff read and relied on Defendant's labeling Representations and omissions to conclude that the Products did not contain harmful microplastics and were "BPA Free."

100.    Defendant's conduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, in violation of 815 ICFA 505/1, et seq.

101.    Defendant violated the ICFA by representing that the Products have characteristics or benefits that they do not have. 815 ILCS § 505/2; 815 ILCS § 510/2(7).

102.    Defendant advertised the Products with the intent not to sell them as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

103.    Defendant engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or misunderstanding in violation of 815 ILCS § 505/2; 815 ILCS § 510/2(3).

104.    Before placing the Products into the stream of commerce and into the hands of consumers, including Plaintiff and reasonable consumers, Defendant knew or should have known that the Products contained harmful microplastics, but Defendant omitted and concealed this material fact to consumers, including Plaintiff and Class members. Defendant chose to label the Products in this way to impact consumer choices and gain market share. Defendant is well aware that all consumers who purchased the Products were exposed to and would be affected by its omissions and would reasonably believe that the Products did not contain harmful microplastics

and that Defendant's Representations were otherwise accurate. However, Defendant's Representations are false and misleading because the Products contain harmful microplastics, especially when heated and used as intended.

105.    Defendant intended that Plaintiff and each of the other Subclass Members would reasonably rely upon the Representations, misleading characterizations, and material omissions concerning the true nature of the Products.

106.    Defendant's Representations, concealment, omissions, and other deceptive conduct were likely to deceive and cause misunderstanding and/or cause Plaintiff and the other Subclass Members to be deceived about the true nature of the Products.

107.    Plaintiff and Class Members have been damaged as a proximate result of Defendant's violations of the ICFA. They have suffered damages as a direct and proximate result of purchasing the Products.

108.    As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Subclass Members have suffered ascertainable losses of money caused by Defendant's Representations and material omissions regarding the presence of harmful microplastics in the Products.

109.    Had they been aware of the true nature of the Products, Plaintiff and Class Members would have paid less for the Products or would not have purchased them.

110.    Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the Subclass Members are entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorney's fees, under 815 ILCS 505/10a.

## COUNT II
## UNJUST ENRICHMENT
### (On behalf of Plaintiff and the Nationwide Class and/or the Illinois Subclass)

111.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

112.    Plaintiff brings this Count on behalf of herself and the Nationwide Class and/or the Illinois Subclass against Defendant.

113.    This claim is brought under the laws of the State of Massachusetts.

114.    Defendant's conduct violated, *inter alia*, state, and federal law by manufacturing, advertising, labeling, marketing, distributing, and selling the Products while misrepresenting and omitting material facts, including by making the labeling Representations alleged herein.

115.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has violated fundamental principles of justice, equity, and good conscience.

116.    Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

117.    Defendant knowingly received and enjoyed the benefits conferred by Plaintiff and Class members.

118.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class members' overpayments.

119.    Plaintiff and Class members seek to establish a constructive trust from which Plaintiff and Class members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for relief and judgment against Defendant as follows:

a.   Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class and Subclasses, and designating Plaintiff's counsel as Class Counsel;

b.   Awarding Plaintiff and Class members compensatory, statutory, or other monetary damages, in an amount to be determined at trial;

c.   Awarding Plaintiff and Class members appropriate relief, including but not limited to actual damages;

d.   For restitution and disgorgement of profits;

e.   Awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

f.   Awarding pre-judgment and post-judgment interest;

g.   For punitive damages; and

h.   Granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: July 8, 2024                                          Respectfully Submitted,

/s/ *James J. Reardon*
(BBO# 566161)
**REARDON SCANLON LLP**
45 South Main Street, 3rd Floor
West Hartford, CT 06107
T: (860) 944-9455
james.reardon@reardonscanlon.com

**LAUKAITIS LAW LLC**
Kevin Laukaitis (*pro hac vice forthcoming*)
954 Avenida Ponce DeLeon
Suite 205 - #10518
San Juan, PR 00907
Phone: (215) 789-4462
Email: klaukaitis@laukaitislaw.com

**REESE LLP**
Michael R. Reese (*pro hac vice forthcoming*)
100 West 93rd Street, 16th Floor
New York, New York 10025
Phone: (212) 643-0500
Email: mreese@reesellp.com

*Attorneys for Plaintiff and the Proposed Classes*